# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHELLE WOJDYLA,<br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>COMMISSIONER<br>OF SOCIAL SECURITY,<br>　　　　　Defendant. | 2:15-cv-974-TFM |

## MEMORANDUM OPINION

March 8, 2016

### I.　Introduction

Plaintiff, Michelle Wojdyla, has brought this action for judicial review of the decision of the Acting Commissioner of Social Security, which denied her application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401–403. The parties have filed cross-motions for summary judgment (ECF Nos. 8, 10), which have been fully briefed (ECF Nos. 9, 11) and are ripe for disposition.

### II.　Background

Plaintiff is a 49-year-old high school and college graduate. Over the years, she has worked at various jobs through a temp agency, while also pursuing a freelance photography and writing career. Following a car accident on July 14, 2006, Plaintiff has allegedly experienced memory loss, poor concentration, headaches, dizziness, balance problems, nausea, noise and light sensitivity, mood swings, and symptoms of depression. As a result, she stopped working a few months after the accident.

Although she refused to go to the hospital immediately following the accident, she went to the emergency room a few days later complaining of "severe headaches." (R. 351). A CT scan was negative, however, and there was "no evidence of any cerebral concussion." (R. 357).

Thereafter, Plaintiff started to experience dizziness and balance issues. (R. 333). She also described feeling weakness in her legs, which predated the accident. In mid-September 2006, a neurologist named Lisa M. Coohill opined that the disequilibrium Plaintiff was experiencing was "likely due to benign positional vertigo as a result of the motor vehicle accident." (R. 334). An MRI was administered in October 2006, the results of which were completely unremarkable. (R. 337). The following month, Dr. Coohill diagnosed Plaintiff with post-concussive syndrome with headache and neck pain and continued dizziness, and ordered her to undergo a consultation for rehab for her balance problems and dizziness. (R. 337).

In April 2007, Plaintiff began treating with Dr. Phillip Kramer, an otoneurologist, who diagnosed her with post concussive syndrome and vertigo. In June 2007, at the suggestion of Dr. Kramer, Plaintiff underwent a neuropsychological evaluation with Keith Cicerone, Ph.D., who believed that Plaintiff's cognitive limitations were not caused by a traumatic brain injury. Rather, they "appear[ed] to be associated with her somatic complaints . . . (dizziness, fatigue, neck pain, headaches) which appear to reflect cervical injury and vestibulopathy." (R. 346). Dr. Cicerone also opined that Plaintiff's hypothyroidism and fibromyalgia could have been "contributing to her cognitive complaints." (R. 346).

Dr. Kramer saw Plaintiff about twice a year from then until May 2012 to manage her symptoms and prescriptions, which included Klonopin for vertigo and Zoloft for her depressive symptoms. While he was treating Plaintiff, Dr. Kramer consistently reported that Plaintiff was in good general health and documented normal test results. Plaintiff reported gradual improvement in her condition, but she nevertheless continued to display symptoms. In June 2010, Dr. Kramer opined that he did not believe Plaintiff could work despite her improvements in some areas. (R. 673). A couple of months later, he noted that Plaintiff's symptoms had likely "plateaued" and

she was likely to see "little improvement from this point." (R. 371). A month before that, Plaintiff's primary care physician, Dr. Paul Kukoff, noted that Plaintiff's symptoms of "unspecified peripheral vertigo" were persisting, such that she "prob[ably] needs to be on permanent disability." (R. 400).

At a May 2011 follow-up with Dr. Kramer, Plaintiff reported "some small gains" in her condition. (R. 363). "Her good days [were] getting slightly better." (R. 363). On one such day, "she was able to start installing a ceiling fan." (R. 363). She reported that she could run one or two errands a day without crying and "[h]er speech may be better." (R. 363). At the same time, Dr. Kramer noted that Plaintiff said that she was still "unable to drive in the dark" and "suffered more falls recently." (R. 363).

Plaintiff applied for DIB on July 6, 2011. Her application was denied at the initial level of review and upon reconsideration by the state agency. In connection with her initial claim, Plaintiff underwent a consultative neurological exam with Rashel Potashnik, M.D., who noted that Plaintiff presented "with rather vague complaints," and, upon examination, "displayed wide based gait and mild nystagmus" but was otherwise normal. (R. 477). On April 29, 2012, Plaintiff underwent a consultative exam with Steven Pacella, Ph.D, in connection with her request for reconsideration. (R. 492). In Dr. Pacella opined that "strictly from the psychological perspective – leaving aside the issues of headache, hypothyroidism, fibromyalgia, etc – and based upon [Plaintiff's] performance on the MSE, she should be able to work within a schedule, attend to a task and sustain a consistent, competitive routine at jobs for which she is already qualified." (R. 496). Dr. Pacella also completed a function-by-function assessment of Plaintiff's condition which found that Plaintiff was, at most, moderately limited in her ability to perform work-related functions.

After her application was denied by the state agency, Plaintiff requested a hearing, which was conducted on October 10, 2013, before Administrative Law Judge Guy Koster. Plaintiff testified at the hearing, as did an impartial vocational expert. According to Plaintiff, "[s]ome days are better than others, but [her symptoms are] always with [her]." (R. 55). If her dizziness isn't "really bad," she will try to run errands like going to the grocery store or taking her mother to the doctor. She can drive, but only does so during the daytime and when it's not raining. Otherwise, during the day, she said that she "sleep[s] a lot on an off, watch[es] some TV, [and] check[s] [her] email." (R. 65). She also testified that she tries to do things around the house, like laundry, but she has difficulty because "bending down to put clothes in the dryer sets off the vertigo." (R. 65).

The ALJ denied Plaintiff's claim on February 7, 2014. After thoroughly recounting Plaintiff's medical history, the ALJ found that she retained the residual functional capacity ("RFC") to perform light work with the following additional restrictions:

> she was limited to only occasional stooping and crouching, and no bending, crawling, kneeling, balancing or climbing of ladders ropes or scaffolds. She must avoid even moderate exposure to hazards, such as unprotected heights and dangerous machinery. She should have no exposure to bright and flashing lights or jobs that require driving at night. In addition, she is limited to simple, routine, and repetitive tasks with short instructions in a low stress stable environment involving no frequent changes in a work setting and non-assembly line pace work. She should have no contact with large crowds or groups of people and little or no interaction with the general public.

(R. 26). After consulting with the vocational, the ALJ determined that there are asignificant numbers jobs in the national economy that Plaintiff can perform, and, thus, she is not disabled under the Social Security Act. The ALJ's decision became final on May 28, 2015, when the Appeals Council denied Plaintiff's request for review. This action followed.

### III. Legal Analysis

#### A. Standard of Review

The Act strictly limits the Court's ability to review the Commissioner's final decision. 42 U.S.C. § 405(g). "This Court neither undertakes a de novo review of the decision, nor does it re-weigh the evidence in the record." *Thomas v. Massanari*, 28 F. App'x 146, 147 (3d Cir. 2002). Instead, the Court's "review of the Commissioner's final decision is limited to determining whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). If the Commissioner's decision is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C. § 405(g). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971). It consists of more than a scintilla but less than a preponderance of the evidence. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010). Importantly, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

#### B. Discussion

Plaintiff argues that the ALJ failed to take the variability of her condition into account when formulating his RFC assessment. The ALJ should not have considered her "'average' ability to work," she argues, "but rather whether [she] can work on her worst day." Pls.' Br. at 14, ECF No. 9. This argument is without merit.

It is true that "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse

days[.]" *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). It is also true that if "half the time [Plaintiff] is well enough that she could work, and half the time she is not[,] [t]hen she could not hold down a full-time job." *Id.*

Nevertheless, the ALJ's conclusion that Plaintiff can perform light work with a number of additional restrictions is supported by substantial evidence. This conclusion was based on the ALJ's finding that Plaintiff's testimony and statements regarding the severity of her condition were simply not credible when considered alongside the other evidence – or lack of evidence – in the record. As the ALJ found,

> The objective findings of treating and examining medical sources, the routine and conservative nature of the claimant's medical care, and the inconsistent and exaggerated statements regarding her activities of daily living throughout the record all serve to diminish her credibility regarding the frequency and severity of her symptoms and the extent of her functional limitations.

(R. 33). "Credibility determinations as to a claimant's testimony regarding pain and other subjective complaints are for the ALJ to make." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 765 (3d Cir. 2009) (citing *Van Horn v. Shweiker*, 717 F.2d 871, 873 (3d Cir.1983)). Here, the ALJ cited an array of evidence, most notably the consistently normal objective findings recorded by Plaintiff's treating doctors and the consultative examiners and her relatively routine and conservative treatment, all of which suggested that Plaintiff was overstating the severity of her condition. The ALJ's RFC finding was also consistent with the assessments of the state agency consultants, whose opinions "merit significant consideration," *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011), and the psychological consultative examiner – none of whom considered Plaintiff to be disabled on account of her impairments. Furthermore, although Plaintiff has not directly challenged the ALJ's decision under the treating source rule, the Court notes that the ALJ's decision to accord less-than-controlling weight to the conclusory

6

opinions of Drs. Zukoff, Kramer, and Furman was supported by substantial evidence because these assessments were inconsistent with other evidence in the record and not well supported by medical findings. *See* 20 C.F.R. § 404.1527(c)(2). Insofar as the ALJ appropriately justified his decision to discredit Plaintiff's testimony and statements regarding the severity of her condition, his credibility finding will not be disturbed. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence.").

    Plaintiff's remaining arguments do not persuade the Court otherwise. First, Plaintiff argues that the ALJ's negative credibility finding was based on "an invented discrepancy between Plaintiff's statements in connection with her initial claim." Pl.'s Br. at 15. In so arguing, Plaintiff appears to be suggesting that the ALJ found that her written statements submitted in connection with her applications were inconsistent with her hearing testimony. Not so. What the ALJ clearly meant in the portion of his decision upon which Plaintiff relies was that Plaintiff's descriptions of her condition, both in writing and at the hearing, were "out of proportion with the objective evidence," (R. 33), not that her statements were themselves internally inconsistent. And when so construed, the ALJ's reasoning is unassailable: there was, as the ALJ concluded, no objective support for Plaintiff's subjective complaints about the disabling nature of her condition in the record. On the other hand, there were discrepancies in the evidence – e.g., during one doctor's visit, Plaintiff walked with an unsteady gait; during another, she didn't – that called into question the veracity of Plaintiff's statements and testimony. Indeed, the ALJ expressly noted that the inconsistencies and discrepancies that he pointed out were "representative of those found in the record," but not meant to be exclusive.

Next, Plaintiff contends that the ALJ inappropriately relied on her ability to do crossword puzzles, use a computer, and install a ceiling fan to undermine her credibility. Here again, the Court disagrees. "Although certainly '[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity,' [*Smith v. Califano*, 637 F.2d 968 (3d Cir.1981)], it is nonetheless appropriate for the ALJ to consider 'the number and type of activities' in which the claimant engages." *Turby v. Barnhart*, 54 F. App'x 118, 122 n.1 (3d Cir. 2002) (quoting *Burns v. Barnhart*, 312 F.3d 113, 130-31 (3d Cir. 2002)). The ALJ did just that, considering the well-documented, albeit gradual, improvement in Plaintiff's condition, which, over time, reached the point that she could perform certain activities that she formerly could not perform, such as those listed by the ALJ. Inasmuch as the ALJ relied on Plaintiff's ability to perform these activities as but one of a host of reasons for discounting Plaintiff's credibility as indicative of the gradual improvement in her condition over time, the ALJ did not err.

Lastly, Plaintiff contends that the ALJ made "highly selective references to the record," omitting any mention of the variability of her symptoms. Pl.'s Br. at 15. This, once again, is an inaccurate assessment. To be sure, courts, including this one, have not hesitated to admonish ALJs for "cherry picking" pieces of evidence that suggest a claimant can perform certain activities, while ignoring the bigger picture. *See, e.g.*, *Hawley v. Colvin*, No. 1:13-CV-296, 2014 WL 3747686, at *7 (W.D. Pa. July 29, 2014) (citing *Rios v. Comm'r of Soc. Sec.*, 444 F. App'x 532, 535 (3d Cir. 2011)). But the ALJ did no such thing here. Rather, the ALJ thoroughly discussed all of the evidence in the record, including Plaintiff's statements regarding the variability in her condition made in the course of treatment, the reports she submitted to the state agency, and her testimony at the hearing. The ALJ gave valid reasons for discounting Plaintiff's statements regarding the severity of her condition, though, and went on to support his RFC

assessment with "objective findings of the treating and consultative examiners," "the assessment of State agency and medical and psychological consultants and the initial and reconsideration levels, and by the assessment of the consultative psychologist Dr. Pacella." (R. 35). Because the ALJ provided a thorough analysis of the evidence he rejected and that which he relied upon in making his decision, his decision will be affirmed. *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 433 (3d Cir. 1999) (explaining "that the ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding").

**IV.   Conclusion**

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges that Plaintiff faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Social Security Act.

For these reasons, the Court will **GRANT** the Motion for Summary Judgment filed by the Acting Commissioner and **DENY** the Motion for Summary Judgment filed by Plaintiff. An appropriate Order follows.

McVerry, S.J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHELLE WOJDYLA,  )
        Plaintiff,  )
)
v.  ) 2:15-cv-974-TFM
)
COMMISSIONER  )
OF SOCIAL SECURITY,  )
        Defendant.  )

## ORDER

**AND NOW**, this 8th day of March, 2016, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Defendant's MOTION FOR SUMMARY JUDGMENT (ECF No. 10) is **GRANTED**, and Plaintiff's MOTION FOR SUMMARY JUDGMENT (ECF No. 8) is **DENIED**. The Clerk shall docket this case **CLOSED**.

BY THE COURT:

s/ Terrence F. McVerry
Senior United States District Judge

cc:    **Lindsay Fulton Osterhout, Esq.**
       Email: lindsay@mydisabilityattorney.com

       **Paul Kovac, Esq.**
       Email: paul.kovac@usdoj.gov

       (via CM/ECF)